## W. C. HOLCOMB V. THE STATE.

No. 9289.    Delivered November 4, 1925.

Rehearing denied March 10, 1926.

### 1.—Murder—Bills of Exception—Qualification of Court—Controls.

Where, on a trial for murder, appellant complains in two bills of exception of the rejection of testimony offered by him upon the trial, and both of his bills are qualified by the court to the effect that the testimony rejected, was subsequently admitted, and of course no error is shown. Where appellant accepts the qualifiications attached to a bill, he is bound by them, and on appeal they are considered as qualified. This is also applicable to appellant's bill of exception No. 4.

### 2.—Same—Argument of Counsel—Not Improper or Hurtful.

Where private prosecutor in his argument to the jury said: "Gentlemen of the jury, he (meaning appellant) will bear the mark of Cain on him as long as he lives, no matter what the verdict of the jury may be," we do not regard such language as abusive or likely to prejudice the jury against appellant, nor think the matter of such a serious nature as to call for an extended discussion. Following Barrer v. State, 83 Tex. Crim. Rep. 198.

### 3.—Same—Evidence—Held, Sufficient—For Murder Verdict.

While in this cause, appellant sought to reduce the homicide to the grade of manslaughter, by reason of the seduction or violation of the chastity of appellant's daughter by deceased, we do not believe that our statutes intend that a man who is informed of an insult or insulting conduct to a female relative, may deliberately plan to kill, and then carry his plan into execution, without any of those evidences of passion and excitement and claim that the killing is reduced to the grade of manslaughter.

### 4.—Same—Continued.

While our statute makes an insult to a female relative adequate cause to produce this condition of mind, the jury are in nowise deprived of their right to say whether in a given case the mind of the slayer was in that condition of rage, excitement or passion as to render it incapable of cool reflection. In the case before us the record reflects a condition of

deliberation and premeditation in the mind of appellant and that perhaps the controlling influence on his purpose was the refusal of deceased to marry his daughter, rather than an outraged resentment of her debauchery by deceased. See Bollin v. State, 93 Tex. Crim. Rep. 452.

ON REHEARING.

**4.—Same—Province of Jury—Verdict Cannot be Disturbed.**

On rehearing we have again carefully examined the evidence in this record, and cannot agree with the appellant that our original opinion that the evidence was sufficient to support the verdict was error. The jury were the arbiters of the various fact questions raised in this record. We think the evidence in such condition as that the verdict is not shown to be the result of prejudice or passion, or lack of calm consideration of the various issues raised, and the motion for rehearing is overruled.

Appeal from the District Court of Haskell County. Tried below before the Hon. Bruce W. Bryant, Judge.

Appeal from a conviction of murder, penalty five years in the penitentiary.

The opinion states the case.

*J. F. Cunningham, A. J. Smith* and *Lon Brooks,* for appellant.

*Sam D. Stinson,* State's Attorney, and *Nat Gentry, Jr.,* Assistant State's Attorney, for the State.

LATTIMORE, JUDGE.—Appellant was convicted in the District Court of Haskell County for murder, and his punishment fixed at five years in the penitentiary.

Appellant was informed that his single daughter was pregnant, and that deceased was the author of her condition. The alleged injured daughter testified that she told her mother "and them" of what deceased did to her about the 15th of November, the alleged assault upon her having taken place in October preceding. The wife of appellant testified that her daughter did not tell her of her condition until February. This killing took place some time in March following. Deceased was sitting in a car and appellant and his son armed with guns approached and both fired. A pistol was found in the pocket of deceased after his death.

There are four bills of exception. One complains of the rejection of the testimony of a Mr. Link, but the qualification of the learned trial judge shows that this witness was subsequently allowed to testify to the matter set out in the bill of exceptions. The second bill of exceptions complains of the same matter and is approved with the same qualification.

The third bill of exceptions complains that an attorney employed to assist the state, in the course of his argument, looked toward appellant and said: "Gentlemen of the jury, he (meaning the defendant) will bear the mark of Cain on him as long as he lives, no matter what the verdict of this jury may be." We are not able to agree with the contention that this was a matter of such serious import as to necessarily or likely cause injury to the appellant. It was not the mention of any fact material to any issue of the case which appears to be dehors the record. It was not the use of any language abusive or likely to prejudice the jury against appellant. We do not think the matter of such serious nature as to call for an extended discussion. Barrer v. State, 83 Tex. Crim. Rep. 198.

The fourth bill of exceptions complains of the rejection of testimony from appellant as to what he told the witness Link referred to in the first and second bills of exception. This bill is also qualified by a statement of the learned trial judge to the effect that he permitted the defendant to testify regarding this matter.

We are not inclined to the view that the evidence does not justify a verdict of guilty of murder. As we understand it, there was no intention on the part of our lawmakers to say that a man who is informed of an insult to his female relative may deliberately plan to kill, and then carry his plan into execution without any of those evidences of passion and excitement which are to be passed upon by the jury—and then claim any right to a conviction only of manslaughter. Our statutes reduce a killing to manslaughter when the jury are of the opinion from the evidence before them that there was in the mind of the slayer such rage, excitement or passion, arising from an adequate cause, as to render the mind of the slayer incapable of cool reflection from which the killing resulted. The statute names an insult to a female relative as an adequate cause to produce this condition of mind, but the jury are in nowise deprived of their right to say whether in a given case, even though there be proof of the existence of that which our statute makes adequate cause, the mind of the slayer was in that condition of rage, excitement or passion as to render it incapable of cool reflection. In the case before us the record reflects rather extended efforts on the part of appellant to bring about the marriage of his daughter and deceased after receiving information of her condition. Friends of appellant were appealed to to effect said marriage. Efforts were made to in-

duce deceased to discuss the matter with appellant or his sons, The record further shows that deceased refused to marry the girl, claiming that he was not guilty, and that he also refused to leave the country. The jury may have believed that the motive for the killing was, in part or in whole, the refusal of deceased to marry the girl.

Without discussing the matter further, we are of opinion that the record does not show that the jury were swayed or influenced by passion or prejudice in their refusal to convict appellant of manslaughter and in rendering a verdict of murder. Bollin v. State, 93 Tex. Crim. Rep. 452. The sensibilities of juries in this country and their ordinary tenderness toward those who seek to justify or mitigate a homicide when the motive assigned is that the deceased had insulted a female relative, present themselves in many records before this court. The verdict in this case does not seem to be the result of hasty consideration or prejudice on the part of the jury.

Finding no error in the record, the judgment will be affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Referring to appellant's renewed complaint at what was said by the attorney for the state, to the effect that appellant will bear the mark of Cain, etc., leads us to say that the jury must be understood as having a fair amount of intelligence, and this jury were bound to know that said attorney had received no revelation from the Deity to the effect that he had placed any mark on the appellant, and also to know that the language used was purely a figure of speech made in the course of argument. If the jury were familiar with Holy Writ, and on this assumption counsel bases his complaint, they knew that the Book says that the mark was put on Cain as a matter of protection from those who otherwise would seek his life. We perceive no injury possible from the argument.

Appellant again urges that the facts negative any fair conclusion other than that he is guilty of no graver offense than manslaughter, and that some statements in our opinion lead to a belief that we have confused this record with another in a companion case. We have again carefully considered the testimony. It is beyond dispute that appellant found out the un-

fortunate condition of his daughter, and who was its author, on February 15, 1924, according to his own testimony. The killing took place on March 3rd following, or more than two weeks after he received this information. He testified that he had talked the matter over with his wife, who told him the doctor said the daughter was in a family way and to get the boy to marry her if he could. That some time later, appellant testified, he went up town looking for deceased but did not find him, and that he then bought a shot gun and walked around town until the sheriff took the gun away from him, and also a Winchester away from his son who was with him, but later gave the guns back to them on their promise to go home. Referring to the occasion of the homicide, appellant said he came to town in a truck. Leaving the gun, he got out of the truck and went to Comer's store for some onion sets, and that deceased came out of said store. Appellant said he called to deceased, "Mack, I want to see you a minute"; that deceased was cranking his car, and walked around back of it—over to the side of the car and got in and looked at appellant, then reached for his gun, jerking his shirt up. Appellant said he then went to his truck, a distance estimated by him to be 70 or 80 feet from where deceased was, got his gun and walked back down to where deceased was in his car and told him again that he wanted to see him, and that deceased made a motion and he, appellant, shot him. We quote a portion of the testimony of appellant:

"When I saw Mack Hart cross the sidewalk I said I wanted to see him, told him to wait a minute. When I told him this I was not standing down on the sidewalk and he was in his car, he was out on the ground; he was cranking his car when I told him this, seems like he didn't hear me, and he walked around back by the side of the car and when he looked up and seen me he grabbed for his gun and got up in the car and I turned around and walked back and picked up my gun and walked to where he was."

Appellant also said, referring to the occasion of going to his truck and getting his gun, after he had called to deceased:

"I don't know whether I was out of the sight of Mack Hart when I went on the north side to get my gun; I was something like seventy or eighty feet from him; he was not going that way. I didn't want to run him out of town, I wanted to talk with him. That is not why I went back to get my gun. I went

back to get my gun if I had any trouble with him I would have some protection."

Appellant also testified that he told Bailey Bingham (the sheriff) to see Mack Hart; "Bailey told me when I asked him if he had seen Mack Hart, he wouldn't tell me what Mack said". Asked on cross-examination if he did not send some people to talk to deceased, appellant said he had talked with Mr. Link and "he told me he had seen some parties, didn't tell me who it was, and they would arrange things. Later he come back and told me he had seen a couple of parties, didn't tell me who they were, and said they had talked with Bailey Bingham and decided to let Bailey go to him and talk to him; that is the reason I didn't do it."

Our merciful law concedes to the frailty of human nature, that same may be swept beyond control by information of insulting conduct or words to female relatives, and, when the jury believes that a killing occurred when the mind was in such condition of uncontrollable anger, rage, resentment, etc., as to render it incapable of cool reflection, and this condition resulted from an adequate cause, the homicide may be reduced to the grade of manslaughter. It was never intended, however, that, conceding the fact of disgraceful and insulting conduct such as might be deemed sufficient to create uncontrollable passion, if the evidence showed that the passion was controlled and efforts made to cause the party guilty of the conduct, to make amends for same or apologize, or do anything of that kind, and in the event he does not, that he may then be killed— such a condition would, ipso facto, bring the offender within the pale of manslaughter. According to his own testimony, on the day of the homicide appellant saw deceased about to get in his car, and was within a few feet of him and spoke to him. That upon getting no response from deceased, appellant turned and walked away a distance of 70 or 80 feet and got his gun and then walked back, and when deceased did not respond to his invitation but made, as appellant claimed, some motion to get a gun, appellant shot. One who thus meets the insulter or traducer or ravisher of his female relative, if under the influence of uncontrollable passion, would seem likely to hurl himself at the throat of the traducer without regard to whether he had a weapon in his hand or not, or whether it was of a deadly character.

The jury were the arbiters of the various fact questions raised in this record. They were to decide whether appellant

acted from uncontrollable passion, or whether his mind was incapable of cool reflection. We think the evidence in such condition as that the verdict is not shown to be the result of prejudice or passion or lack of calm consideration of the various issues raised.

Being unable to agree with appellant's contentions, the motion for rehearing will be overruled.

*Overruled.*